# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JUSTIN LADNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:07-CV-1386-VEH** |
| | ) | |
| **LITESPEED MANUFACTURING** | ) | |
| **COMPANY, a Tennessee** | ) | |
| **Corporation, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

This lawsuit arises out of an accident sustained by the Plaintiff, Justin Ladner

("Ladner"), on July 9, 2007[1], when he was riding a "2006 Blade Racing Bicycle, . .

. the 'fork' below the handle bar broke completely into [sic], causing [Ladner] to

catastrophically fall against the asphalt with his head causing [personal] injur[y] . .

. ." (Complaint, doc. 1, ¶ 2). Ladner has sued Litespeed Manufacturing Company,

Real Design USA, and American Bicycle Group, LLC ("American"),[2] the

---

[1] In later pleadings, Ladner says that the date of the accident was May 4, 2007. Ladner
has not, however, amended his Complaint to reflect that date.

[2] In its Answer, doc. 7, American Bicycle Group, LLC, (hereinafter "American") states
that Litespeed Manufacturing Company and Real Design USA are wholly owned by American

"design[ers], assemble[rs], manufacture[rs], s[ellers], furnishe[rs], or supplie[rs]" of the bicycle ( *id*., ¶ 3), under theories of: (1) the Alabama Extended Manufacturers Liability Doctrine (Count One); (2) breach of warranty (Count Two); and (3) negligence (Count Three).[3]

Pending before the court are the following Motions: American's Motion to Dismiss Based Upon Spoliation of Evidence (doc. 10); Ladner's Alternative Motion for Additional Time to Conduct Discovery (doc. 14); and American's Motion to Strike Affidavit of Dr. Thomas Talbot (doc. 15).   All such motions have been responded to or the time for response has expired; therefore, the motions are under submission.   For the reasons hereinafter set forth, the Motion to Dismiss (doc. 10) is **DENIED**; the Motion for Additional Time to Conduct Discovery (doc. 14) is **DENIED AS MOOT**; and the Motion to Strike (doc. 15) is **GRANTED IN PART**

---

and that Litespeed Manufacturing Company and Real Design USA merely constitute trade names, or are "fully incorporated within" American, or are "inactive legal entities."  Ladner is therefore **ORDERED TO SHOW CAUSE**, on or before February 20, 2008, why Litespeed Manufacturing Company and Real Design USA should not be dismissed from this action without prejudice, and the case style revised.

[3] Count Three was added by Plaintiff's First Amendment to the Complaint, doc. 16, which was filed within the time period set by the scheduling order, but without leave of court or consent of American, after American had answered.  American has neither answered the Complaint as amended, nor moved to strike the Amendment as filed.  Perhaps American is waiting to see how the court rules on its pending Motion to Dismiss, which is denied in this Order.  In any event, the court would deny a motion to strike, and has considered the First Amendment to the Complaint in its analysis.  Further, based upon the court's denial (contained herein) of American's Motion to Dismiss, American is hereby **ORDERED** to respond to the First Amendment to Complaint no later than February 29, 2008.

**AND DENIED IN PART**.

I.   **THE MOTION TO STRIKE**

Because the Affidavit of Dr. Thomas Talbot (the "Talbot Affidavit") was filed in opposition to American's Motion to Dismiss, the court first addresses American's Motion to Strike the Talbot Affidavit.

The Motion to Strike is premised upon *Daubert*[4] and FED. R. EVID. 702.  The Motion attacks both Dr. Talbot's credentials as sufficient to allow him to opine as to the matters set forth in his Affidavit, and also the opinions themselves.

A.   **The Expert Witness Standard.**

In evaluating expert testimony, the Eleventh Circuit Court of Appeals has outlined the following analysis:

> The starting point for our analysis is Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:

>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

As the Supreme Court made abundantly clear in *Daubert*, Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence. 509 U.S. at 589 n. 7, 597, 113 S.Ct. at 2795 n. 7, 2798. The trial courts are also required to play the same gatekeeping function considering the admissibility of technical expert evidence. *Kumho Tire* [*Co., Ltd. v. Carmichael*, 526 U.S. [137], 147, 119 S.Ct. [1167], 1174[, 143 L.Ed.2d 238 (1999)]. This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *McCorvey* [*v. Baxter Healthcare Corp.*], 298 F.3d [1253,] 1257 [(11th Cir. 2002)].

The importance of *Daubert*'s gatekeeping requirement cannot be overstated. As the Supreme Court framed it in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991) ("Weinstein")). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED.R.EVID. 703.

Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding

4

> the matters he intends to address; (2) the methodology by
> which the expert reaches his conclusions is sufficiently
> reliable as determined by the sort of inquiry mandated in
> Daubert; and (3) the testimony assists the trier of fact,
> through the application of scientific, technical, or
> specialized expertise, to understand the evidence or to
> determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc*., 158 F.3d 548, 562 (11th
Cir.1998) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794). While
there is inevitably some overlap among the basic
requirements--qualification, reliability, and helpfulness--they remain
distinct concepts and the courts must take care not to conflate them.
*Quiet Tech.* [*DC-8, Inc. v. Hurel-Dubois UK Ltd.*], 326 F.3d [1333],
1341 [(11th Cir. 2003)].

The proponent of expert testimony always bears "the burden to show
that his expert is 'qualified to testify competently regarding the matters
he intend [ed] to address; [ ] the methodology by which the expert
reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony
assists the trier of fact.' " *McCorvey*, 298 F.3d [at] 1257 (alterations in
original) (quoting *Maiz* [*v. Virani*], 253 F.3d [641] 664 [(11th Cir.
2001)]). The burden of establishing qualification, reliability, and
helpfulness rests on the proponent of the expert opinion, whether the
proponent is the plaintiff or the defendant in a civil suit, or the
government or the accused in a criminal case.

Turning first to the qualification of the expert, we observe that experts
may be qualified in various ways. While scientific training or education
may provide possible means to qualify, experience in a field may offer
another path to expert status. In fact, the plain language of Rule 702
makes this clear: expert status may be based on "knowledge, skill,
experience, training, or education." (emphasis added). The Committee
Note to the 2000 Amendments of Rule 702 also explains that "[n]othing
in this amendment is intended to suggest that experience alone . . . may
not provide a sufficient foundation for expert testimony." FED.R.EVID.
702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' " FED.R.EVID. 702 advisory committee's note (2000 amends.) (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc*. (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation--i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. As the Supreme Court put it, "the Rules of Evidence–especially Rule 702– . . . assign to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation." *Id*. at 597, 113 S.Ct. at 2799.

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying

the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Quiet Tech*., 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)).

These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. See Kumho Tire, 526 U.S. at 150- 152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702 advisory committee's note (2000 amends.); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999) ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176; *see also Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir.1999) ("In determining whether an expert's testimony is reliable, the Daubert factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training.'"). As the Supreme Court explained in *Kumho Tire*:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's

experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151, 119 S.Ct. at 1176. Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. As a result, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152, 119 S.Ct. at 1176. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial. *See* FED.R.EVID. 702 advisory committee's note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. See 4 Weinstein's Federal Evidence § 702.03[2] [a].

Because of the powerful and potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is

8

appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see Rouco*, 765 F.2d at 995, or if expert testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (*per curiam*) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in FED.R.EVID. 702"); *see also United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence"). Indeed, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632; *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

*U.S. v. Frazier,* 387 F.3d 1244, 1259 -1263 (11th Cir. 2004) (footnotes omitted).

**B.     The Talbot Affidavit**.

The Talbot Affidavit contains six opinions, set out in separate paragraphs.[5] On its face, Dr. Talbot's credentials qualify him to give the first, second, and sixth

---

[5] However, the court notes that, on February 1, 2008, Ladner filed a supplemental affidavit from and materials relating to Dr. Talbot and an affidavit from David B. Powell (Plaintiff's Rule 26(a)(2) Expert Witness Disclosures, doc. 20).   American has not moved to strike either of those affidavits.  Further, in document 20, Ladner states that he has provided the court with an affidavit from an Eric White.  The court has not been able to locate any such affidavit.

opinions.  Further, the court finds no basis to exclude these opinions at this time.[6]

Therefore, the court **DENIES** the Motion to Strike, insofar as it relates to the first,

second, and sixth opinions.

However, as to the third, fourth, and fifth opinions set out in the Talbot

Affidavit, the court **GRANTS** the Motion to Strike as to the portions underlined

below, for the reasons noted.

The third opinion is as follows.

> \*      The wheel of the subject bicycle is presently in good condition
> and has been used periodically since the date of the wreck.  It is
> my understanding that no maintenance has been performed on the
> front wheel, including the tire and tube, and the front wheel is
> visibly in tact [sic] and the frame is perfectly round and
> undamaged.  The pedals and frame of the bicycle are undamaged.
> There is no evidence of any prior damage to the bicycle or any
> abuse that contributed in any way to cause the failure of the fork
> on the [date of the accident].

The underlined portion is struck as hearsay.  FED. R. EVID. 602 (requiring evidence

that a witness have personal knowledge of the facts to which he testifies); *see also*

FED. R. EVID. 801-07 (discussing hearsay).  In addition, the underlined language

would presumably be cumulative of the testimony of a person (presumably Ladner)

who did have personal knowledge of these facts, and therefore would not assist the

---

[6]  Although the court will not allow Dr. Talbot to testify, if this case goes to trial, that the conclusion in his sixth opinion is "inescapable," he can give his expert opinion.  He cannot tell the jury what theirs must be.

trier of fact.  Finally, the underlined language does not require specialized knowledge and to have it stated by an expert would be misleading and unduly persuasive.

The fourth opinion is as follows.

* <u>The area of the road where the failure of the fork occurred is paved and smooth.  There is no defect in the road to contribute to the failure.</u>

The first sentence of the underlined language would presumably be cumulative of the testimony of Ladner and of the photographs of the scene and, therefore, would not assist the trier of fact.  Finally, none of the underlined language requires specialized knowledge and to have it stated by an expert would be misleading and unduly persuasive.

The fifth opinion is as follows.

* <u>Mr. Ladner is an experienced cyclist with great knowledge in bicycle operation, maintenance and repair.  Lack of experience or operator error did not contribute in any way to the failure of the fork or his injuries and damages.</u>

Talbot's credentials do not qualify him to make any of these statements and they are struck on that basis.  Further, these statements are struck for lack of personal knowledge and as hearsay.  Finally, these statements would be cumulative of the testimony of Ladner and to allow an expert to repeat them would be misleading and unduly persuasive.

11

## II.    THE MOTION TO DISMISS

American's Motion to Dismiss is based upon the fact that the broken bicycle fork has mysteriously disappeared from Ladner's counsel's office.  American claims that this amounts to spoliation of evidence and that, under the applicable analysis, this court should impose the admittedly "ultimate sanction" of dismissal of the action. American cites five cases[7] in its Motion and none on the issue of spoliation sanctions in its Motion to Strike (which apparently was also its reply to Ladner's Response to American's Motion to Dismiss).  Those cases are all distinguishable from the instant case.  The court will distinguish them in the order that they appear in American's brief.

### A.    The Cases Cited in American's Brief.

*Flury v. Daimler-Chrysler Corporation*, 427 F.3d 939 (11th Cir. 2005), is distinguishable because the plaintiff there knew the evidence (a wrecked vehicle) was going to be taken by his insurance company and sold for salvage and allowed that to happen without notifying the defendant.  In this case, there is no intimation that Ladner or his counsel knew that some unknown person, perhaps a janitor, would

---

[7] Neither party provided even one pinpoint citation.  The court has reviewed its Uniform Initial Order entered in this case and determined that the Order does not require pinpoint cites. The court has revised its Uniform Initial Order so that this oversight does not occur in future cases.  In any event, the court hereby **ORDERS** that any future pleadings by either party must, when citing to authority, include pinpoint cites.

12

remove the broken fork.

In *Iverson v. Xpert Tune, Inc.*, 553 So.2d 82 (Ala. 1989), the plaintiff "testified that he discarded the new fuel pump . . ." which was the subject of the lawsuit.  *Id.* at 84.  The trial court found the plaintiff's explanation for his actions not credible. Based on the evidence, including the testimony of the plaintiff, the trial court found that

> [t]his case falls within the rationale for dismissing an action for refusal to provide discovery. This is not a case of mere negligent loss of the fuel pump. *Iverson's actions on their face, particularly his failure to attempt to retrieve the fuel pump, amount to gross negligence; and when Iverson's actions are coupled with his explanation, the Court concludes that Iverson willfully discarded the fuel pump to avoid production.*

*Id*. at 86 (emphasis in original).

The Supreme Court of Alabama affirmed, stating that

> we find credible evidence from which the trial court found that Iverson was guilty of willful conduct - that Iverson, through his actions, failed to exercise any precaution to safeguard the fuel pump and to protect it from being destroyed or discarded; that he failed to make any effort to determine the whereabouts of the fuel pump following its removal from his vehicle; and that due to Iverson's own actions, crucial evidence in this case no longer existed and its disposal, destruction, or suppression occurred subsequent to Xpert's request to inspect the fuel pump but prior to the scheduled inspection.

Id. at 86-87.

Again, there is nothing in this case to indicate willful conduct, or failure to

exercise any precautions to safeguard the broken bicycle fork.  Certainly, a client who delivers important evidence to his attorney has every reason to believe that that evidence will not mysteriously disappear.

*Cincinnati Insurance Company v. Synergy Gas, Inc.*, 585 So.2d 822 (Ala. 1991), is also distinguishable.  American cites *Cincinnati Insurance* as: (1) a case in which "[t]here was no allegation of malicious intent on the part of [the plaintiff]; and (2) one that "holds that spoliation does not have to be intentional to justify dismissal of the case."  (Motion to Strike, pp. 3, 5).  However, a close reading of *Cincinnati Insurance Company* reveals that the trial court found, and the Supreme Court affirmed, that the plaintiff "deliberately disposed of" the evidence.

> In the present case, the trial court found that the plaintiffs had deliberately disposed of the items that were later the subject of the request for production. Although the trial court noted that there had been no "allegation" of malicious intent on the part of the plaintiffs in destroying the items and that the Shelbys' conduct "might be excusable" because of their lack of knowledge of the importance of preserving evidence for future litigation, the trial court, understandably, could find no justification for Cincinnati's conduct. As we read its order, the trial court found that Cincinnati had willfully allowed the destruction of the items in question, with full knowledge of the importance of those items as evidence in any future litigation. Our conclusion in this regard is based on the trial court's findings that Cincinnati had fire investigators on the scene within three days after the fire; that those investigators had quickly concluded that the gas system allegedly installed by Synergy was the cause of the fire; and that Cincinnati, as subrogee under the Shelbys' policy, was aware of the importance of preserving the evidence

for future litigation. We also find it to be significant that the plaintiffs'
complaint states that Cincinnati paid the Shelbys over $291,000 under
the terms of the policy. Because such a large sum of money was
involved, it is certainly not difficult to understand why the trial court
apparently believed that Cincinnati was aware soon after the fire that
future litigation was likely.

*Id*. at 827 (emphasis supplied).

*Story v. RAJ Properties, Inc.*, 909 So.2d 797 (Ala. 2005), is accurately cited for the five factors to consider "in analyzing a spoliation-of-the-evidence issue [for purposes of determining the appropriate sanction to impose]: (1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal."  *Id*. at 802-803.   The court agrees that these are the appropriate five factors under Alabama law.  American cites *Story* for no other proposition.  However, the court notes that, in *Story*, the court applied those factors and sustained the entry of summary judgment against a plaintiff where: (1) the plaintiff, the owner and first occupant of a synthetic stucco ("EIFS") clad house, sued the builder, the alleged manufacturer of the EIFS, the installer of the EIFS, and the distributor of the EIFS (the "EIFS defendants").  *Id.*  After the plaintiff filed the lawsuit, he

began extensive repair work on his house, including removal of the

EIFS, repair of the alleged damage, and recladding the house with a brick exterior. The repair work took place from September 2001 to March 2002. During the course of the repairs, [the plaintiff] took numerous photographs of the alleged damage to the house. However, [the plaintiff] did not inform the EIFS defendants that repairs were being made until after the repairs had been completed. As a result, none of the EIFS defendants inspected the alleged damage to the house during the course of the repairs, although they did make some effort to do so.

*Id*. at 799-800 (footnotes omitted).

An expert for one of the EIFS defendants inspected the home but "<u>testified</u> that because the repairs to the house already had been made, he was prevented from determining who had manufactured the EIFS that had been applied to Story's house, whether the application of the EIFS conformed to manufacturer's specifications and guidelines, and the extent and cause of any damage." *Id*. at 800 (emphasis supplied). An expert for another of the EIFS defendants <u>testified</u> that he did not inspect the home because it would have been "futile [to do so because] the EIFS had been removed, any alleged damage to the house had been repaired, and the house had been reclad with brick." *Id*.

The EIFS defendants moved for summary judgment, alleging spoliation of the evidence. *Id.* The plaintiff

responded that his house had been available for inspection during the repair process, that he took photographs in an effort to preserve the evidence, that those photographs were available for use by the EIFS defendants, that he went forward with the repairs to the house because

16

he believed the house would collapse if the repairs were not made, and
that some of the EIFS material was available for inspection.

*Id*.

Also in response, the plaintiff provided the affidavit of his expert, "which
stated that the photographs attached to his inspection report make 'clear that the
[plaintiff's] home suffered from moisture intrusion and damage caused' by 'EIFS
installation not consistent with manufacturer's recommended guidelines.'" *Id*. at 801
n. 4.

The trial court entered summary judgment for the EIFS defendants, solely on
the basis of spoliation of the evidence.  The trial court did not mention the plaintiff's
expert's affidavit referenced above.  *Id*.

The Supreme Court affirmed, explaining that whether or not the destruction of
evidence warranted the sanction of summary judgment was a question for the trial
court, not for a jury.

> In reviewing the trial court's decision, we consider whether the trial
> court exceeded its discretion in entering the summary judgments for the
> EIFS defendants instead of imposing another, less severe, sanction. The
> trial court is in a better position than is an appellate court to determine
> whether the remaining evidence could substitute for the destroyed
> evidence. It is far from clear that photographs are an adequate substitute
> for the item itself and for an analysis of that item. The trial court had
> before it evidence indicating that the evidence destroyed was important,
> if not essential, to the EIFS defendants' defense. We do not find with
> respect to this factor that the trial court exceeded its discretion in

entering summary judgments for the EIFS defendants on the ground of spoliation of the evidence instead of imposing some less severe sanction.

*Id*. at 804 (internal citation omitted).

*Neal v. Easton Aluminum, Inc.*, 15 A.D.3d 459, 790 N.Y.S.2d 70, 2005 N.Y. Slip Op. 01176 (2005), is distinguishable because it applied New York law.[8]  This court certainly cannot tell whether or not the *Neal v. Easton* court considered the five factors that Alabama law informs this court to apply.  *See Story v. RAJ Properties, Inc.*, 909 So.2d 797 (listing the five factors).  Moreover, American has failed to demonstrate that any factors applied by the court in *Neal* are consistent with federal spoliation principles.  *See* Section II.B.2, *infra*.

**B.     Analysis.**

**1.     American has failed to carry its burden under *Story*.**

American, in its brief, goes through the five factors which *Story* informs this court to apply.  However, notably missing from the court file is <u>any</u> affidavit stating that the evidence which remains[9] is insufficient for American to defend the case.

---

[8]  The facts are, however, remarkably similar to this action, in that the product there was a bicycle fork and it was apparently stolen from the plaintiff's attorney's office.

[9]  Which Ladner tells the court are: (1) the photographs; (2) his expert's report; and (3) two specimen forks of the same type and manufacture.

Instead, the motion is full of statements by counsel that only the actual broken fork can possibly suffice.[10]  However, Ladner has filed expert affidavits that the evidence that remains is sufficient.  (*See* Talbot Affidavit; *see also* attachments to court document 20).  American has not provided any expert affidavit as to its attorneys' assertions about how it is not able to adequately defend itself with the evidence that remains.  "Statements by counsel in briefs are not evidence."  *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).[11]  American has the burden to prove that, after applying the *Story* factors, this court should dismiss Ladner's case. American has failed to carry its burden.

_____

[10]  In that respect, this case is the mirror image of *"Thompson v. Gardner,* 889 So.2d 596 (Ala.Civ.App. 2004), a case also involving EIFS, in which the plaintiff had taken numerous photographs of the house during the recladding work, and the defendant's experts testified that they were unable to determine from the photographs the cause or extent of any EIFS damage. In entering a summary judgment on the ground of spoliation of the evidence, the trial court found that the EIFS that had been destroyed during the repair work was 'the evidence' in the case. The Court of Civil Appeals affirmed the summary judgment. We recognize that, in *Thompson,* the testimony of the defendant's experts was undisputed, whereas [the plaintiff in this case] has presented an expert who disputes the testimony of the EIFS defendants' experts and who testified that EIFS damage can be determined from the existing photographs."

*Story v. RAJ Properties, Inc.,* 909 So.2d at 803 n. 7.

In the present case, Ladner's affidavits (including those filed by Ladner at document 20, which American has not challenged) are undisputed by any affidavit from an expert on American's behalf.

[11]  *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

2.     **American has failed to show that Alabama law is consistent with federal law under the facts of this case.**

Although American correctly agrees that federal law controls,[12] other than *Flury v. Daimler Chrysler Corporation*, 427 F.3d 939, American totally fails to discuss federal law.   In *Flury*, the Eleventh Circuit found federal law controlling[13] and noted that "[d]ismissal represents the most severe sanction available to a federal court." *Id*. at 944.  *Flury* also recognized that federal courts may necessarily need to examine State factors to the extent they are "<u>wholly consistent with</u> federal spoliation principles." *Id*. (emphasis supplied).

American has pointed out to the court no <u>federal</u> case in which any sanction, much less the sanction of dismissal, was imposed for the loss of evidence where there was no allegation or showing of bad faith, or even negligence, on the part of the plaintiff.  Further, American has failed to show that Alabama law of sanctions for spoliation as applied to the facts of this case is consistent with federal law on that issue.   This court is not obligated develop that argument for American.  *See Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or

---

[12]  Motion to Dismiss, doc. 10, § 3.

[13]  "[F]ederal law governs the imposition of spoliation sanctions [ ] . . . because spoliation sanctions constitute an evidentiary matter." *Flury,* 427 F.3d at 944 (citations omitted).

provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

### 3.    Federal law requires a showing of willfulness or bad faith and that no lesser sanction will suffice.

*Flury* clearly states that "[d]ismissal represents the most severe sanction available to a federal court, and therefore should only be exercised where there is a showing of [willfulness or] bad faith and where lesser sanctions will not suffice." *Flury*, 427 F.3d at 944 (citation omitted); *see also Continental Cas. Co. v. Compass Bank*, WL 533510, *13-14 (S.D.Ala. 2006) ("[T]here has been no showing by plaintiff that federal spoliation law is akin to Alabama law such that dismissal, or some other sanction, is warranted where a party destroys (or alters) evidence prior to litigation, [therefore] the undersigned declines plaintiff's invitation to sanction defendant for actions it took prior to the filing of the instant law suit. . . . [Plaintiff] has supplied this Court with no evidence that [defendant] altered its records after the filing of the lawsuit; therefore, this Court finds no basis upon which to find that [defendant] acted in bad faith and, consequently, no basis to sanction [defendant], by dismissal, for its alleged spoliation of evidence or for granting plaintiff any lesser sanction. *Cf.*, *Flury*, *supra*, 427 F.3d at 944-945").

Additionally, the commentary to the 1970 Amendment to FED. R. CIV. P. 37 makes explicit the requirement of "willfulness" under federal spoliation analysis.

Rule 37 provides generally for sanctions against parties or persons unjustifiably resisting discovery.

******

[Prior to the 1970 Amendments], Rule 37 sometimes refer[red] to a "failure" to afford discovery and at other times to a "refusal" to do so. Taking note of this dual terminology, courts have imported into "refusal" a requirement of "wilfullness." See *Roth v. Paramount Pictures Corp.,* 8 F.R.D. 31 (W.D.Pa.1948); *Campbell v. Johnson,* 101 F.Supp. 705, 707 (S.D.N.Y.1951). In *Societe Internationale v. Rogers,* 357 U.S. 197 (1958), the Supreme Court concluded that the rather random use of these two terms in Rule 37 showed no design to use them with consistently distinctive meanings, that "refused" in Rule 37(b)(2) meant simply a failure to comply, and that wilfullness [sic] was relevant only to the selection of sanctions, if any, to be imposed. Nevertheless, after the decision in *Societe,* the court in *Hinson v. Michigan Mutual Liability Co.,* 275 F.2d 537 (5th Cir. 1960) once again ruled that "refusal" required wilfullness. Substitution of "failure" for "refusal" throughout Rule 37 [was intended to] eliminate this confusion and bring the rule into harmony with the *Societe Internationale* decision. See Rosenberg, *supra*, 58 Col.L.Rev. 480, 489-490 (1958).

American fails both of these tests.  It has not even alleged willfulness or bad faith (and the facts would not support such an allegation).  Absent willfulness or bad faith, under Rule 37, the sanction of dismissal (or default judgment[14]) is not

---

[14] *See, Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 131 (S.D.Fla. 1987) ("Before the ultimate sanction of default judgment may be entered, this Court must make the

appropriate.

Further, as stated *supra*, American has wholly failed to provide any <u>evidence</u> to counter Ladner's evidence that American's prejudice resulting from Ladner's loss of the bicycle fork does not preclude a determination of the cause of the fork's failure.

Therefore, the Motion to Dismiss is due to be, and is hereby, **DENIED**.

III.   <u>**THE MOTION FOR ADDITIONAL TIME TO CONDUCT DISCOVERY**</u>

Ladner's response to American's Motion to Dismiss asks the court to deny the Motion and alternatively moves for additional time to conduct discovery. Given the passage of time since the Motion to Dismiss was filed, the fact that discovery was never stayed in this action, and the court's denial, *supra*, of American's Motion to Dismiss, the Motion for Additional Time to Conduct Discovery (doc. 14) is **DENIED** as **MOOT**.

---

following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff was prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the punishment-and-deterrence goals set forth in *National Hockey League* and its progeny. These prerequisites have been developed as a means of ensuring the proper balance between the need to engender good-faith adherence to the rules of discovery, on the one hand, and a commitment to protecting the parties' constitutional and policy interests in a full and fair adjudication of their claims, on the other.")

**DONE** and **ORDERED** this the 14th day of February, 2008.


**VIRGINIA EMERSON HOPKINS**
United States District Judge