# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **JUSTIN LADNER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:07-CV-1386-VEH** |
| | ) |
| **LITESPEED MANUFACTURING** | ) |
| **COMPANY, a Tennessee** | ) |
| **Corporation, et. al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Currently before the Court is the Defendant's[1] Motion for Summary Judgment

(Doc. 48.), which incorporates a *Daubert* motion to strike affidavits filed by the

Plaintiff's experts,  and the Defendant's Motion to Strike Affidavits, Testimony and

Exhibits (Doc. 50).  This case arises out of the unfortunate biking accident of the

Plaintiff, Justin Ladner, who alleges he was injured due to the failure of a component

---

[1]  Although this action is brought against Litespeed Manufacturing Company
("Litespeed") and Real Design USA ("Real Design"), as well as American Bicycle Group, LLC
("American"), American is the parent company of both Litespeed and Real Design.  (*See* Doc. 21
at 1; Margin Order of Feb. 25, 2008.)   Thus, the Court will refer to the defendant as "Defendant"
throughout this opinion.

in his bicycle.  While the Plaintiff argues that his accident was caused by a defective component in his bicycle, Defendant claims that the component failed due to a prior accident, natural wear of the bike, and improper maintenance.  For reasons discussed more fully in the remainder of this opinion, the Court finds that Motion to Strike is due to be **GRANTED IN PART** and otherwise **DENIED**.  Defendant's *Daubert* motion to strike the affidavits of Plaintiff's experts is due to be **GRANTED IN PART** and otherwise **DENIED**.   Finally, the Motion for Summary Judgment is due to be **GRANTED IN PART** and otherwise **DENIED**.

## II.   FACTUAL AND PROCEDURAL HISTORY[2]

### A.   Background Information and The Accident

Justin Ladner ("Ladner"), the plaintiff in this case and an avid biker, purchased a Litespeed *Blade*, a triathlon time trial bike, from Bob's Bikes in April, 2006.  AF # 1[3].  Ladner's *Blade* came equipped with a carbon-fiber fork, which is a lightweight

---

[2]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[3]  The designation "AF" stands for admitted fact and indicates a fact offered by Defendant that Ladner has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case.  Whenever Ladner has adequately disputed a fact offered by Defendant, the Court has accepted Ladner's version. The Court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of Defendant's Statement of Facts as set forth in Doc. 48 and responded to by Ladner in Doc. 49.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF # 5.2) would indicate the second sentence of paragraph 5 of

piece of equipment that supports the front wheel of the bicycle and is typical in high-performance bicycles intended for competitive racing. (Doc. 34, Ladner Dep. at 12:6-21.)  Ladner initially read the owner's manual, but did so only in a cursory manner. (*Id.* at 147:20-148:15.)  He is a careful cyclist and makes sure to inspect his bicycle each time before he rides it, including checking the frame for cracks. (*Id.* at 149:21-150:19.)  Although he was very knowledgeable about bicycles, Ladner always used a mechanic to perform repair work on his bike.  AAF # 2.

Shortly after he purchased his *Blade*, in July of 2006, Ladner had an accident on his bicycle when he collided with a fellow cyclist, causing Ladner and his bike to fall onto its right side.  AF # 28.  It was a low-speed incident; Ladner only suffered bruising to his knee, and his bike was largely unharmed, with the exception that his wheel needed to be trued (a term used for aligning a bicycle wheel). (Doc. 34, Ladner Dep. at 35:10-41:21.)

His riding otherwise occurred without incident until the accident that gave rise to this lawsuit. (*Id.* at 35:10-15.)  Ladner rode the bicycle for approximately ten (10) hours per week from the time he purchased the bicycle until the time of the accident

---

Defendant's Statement of Facts is the subject of the Court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Ladner's Statement of Facts contained in Doc. 49 and responded to by Defendant in Doc. 51. Any other facts referenced by the parties that require further clarification are dealt with later in the Court's opinion.

that gave rise to this lawsuit.  AAF # 2. Prior to his May, 2007 accident, Ladner did not notice anything wrong with his bike.  AAF # 17.  The bicycle was ridden only on asphalt roads and was never taken off road.  AAF # 18.  Every time he rode his bicycle, Ladner made sure to inspect his bike, including checking the frame for cracks.  AAF # 15.  Ladner would also make sure that, when traveling across railroad tracks on his bicycle, he traveled no more than five to seven miles per hour.  AAF # 13.

In May, 2007, while Plaintiff was riding at approximately twenty miles per hour, the top portion of his bicycle's fork snapped in half.  AAF # 19.  This equipment failure caused Ladner to fall off the bike, crashing to the ground.  *Id.* Ladner remained conscious after the incident, but his face and mouth were so damaged that he could not yell for help.  (Doc. 29, Ladner Aff. at ¶ 4.)

The accident was observed by Joe Hughes, a mechanic at WTI Transport in Tuscaloosa, Alabama.  (Doc. 29, Hughes Aff. at 3.)  He observed the bicycle as the fork  failed and saw Ladner hit the pavement face first, sliding approximately fifteen feet in the process.  (*Id.*)  Hughes and a co-worker attended to Ladner at the scene of the accident.  (*Id.*)  Ladner's face was extremely bloody and he was missing several teeth.  (*Id.*) Another member of WTI Transport, Mike Samford, kept the bike in his office until after the accident.  (*Id.*, Doc. 29, Hughes Aff. at 2.)

4

Despite his experience with bicycles generally, Ladner had never experienced or heard of a similar failure with no impact to the fork. (Doc. 34, Ladner Dep. at 73:21-74:5.) Most of the time, impacts that would initiate the gradual degradation of a carbon fork would be detectable on the surface of the fork before sudden failure. AF # 33.

**B.     Procedural History**

Ladner avers that the accident was caused by a manufacturing defect. (Doc. 49 at 8, ¶ 1.) Thus, he filed this claim in Federal Court on July 27, 2007. (*Id.*) Ladner has amended his complaint twice (*see* Docs. 16, 45), and in its most recent iteration he alleges four distinct causes of action, including: (1) a violation of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"); (2) breach of warranty; (3) negligence; and (4) failure to warn. (*Id.*)

Subsequent to filing the lawsuit, however, counsel for Ladner lost the allegedly defective carbon fork, the key piece of evidence in this lawsuit; consequently, Defendant moved to dismiss the case based upon spoliation of evidence. (*See* Doc. 10.) In opposing the motion, Ladner relied in part upon an affidavit provided by his expert, Dr. Thomas Talbot (Doc. 14, Talbot Aff.), which the Defendant moved to strike. (Doc. 15.) In its February 14, 2008 Memorandum Opinion and Order (Doc. 21), the Court denied the motion to dismiss and granted the motion to strike in part,

striking portions of Dr. Talbot's opinion that were cumulative, hearsay, or were made with a lack of personal knowledge.  (Doc. 21 at 10-12.)  The Court otherwise denied the motion to strike, finding that Talbot's credentials qualified him to offer his opinion.  (*Id.* at 9.)

Defendant then filed a Motion for Summary Judgment (Doc. 33) and an additional Motion to Strike (Doc. 32), this time challenging the expert testimony of both Dr. Talbot and Dr. David Powell.   Because these submissions and their oppositions did not comply with Appendix II of the Court's Uniform Initial Order, the Court struck both of the motions as well as the briefs in support and the briefs in opposition.   (Doc. 44.)   Defendant then filed a renewed Motion for Summary Judgment (Doc. 48), which includes both a *Daubert* motion to exclude Ladner's experts[4], and a Motion for Summary Judgment, which argues that Ladner cannot demonstrate that Defendant's product was defective.   Defendant separately filed a motion to strike certain affidavits, testimony and exhibits (Doc. 50) relied upon by Ladner in support of his opposition.   These motions are now under submission. The Court notes that although a reply brief was filed in the motion for summary judgment, Defendant curiously has made no attempt to counter any of the legal arguments raised

---

[4]  This motion would effectively decide the case. Thus, in the Court's Order Striking All Pending Motions and Briefs in Support Thereof (Doc. 44), the Court Ordered Defendant to submit one combined dispositive motion.

by Ladner in his opposition, opting instead only to reply to Ladner's statement of undisputed facts. (*See* Doc. 51.)

## C.    Plaintiff's Experts

In support of his case, Ladner relies heavily on the testimony of expert witnesses who claim that the failure of the carbon fork was the product of a manufacturing defect.  (Doc. 49 at 1.)  Defendant's own expert argues that the equipment failure was the result of Ladner's July, 2006 accident and his failure to properly service his bicycle.  (*See* Doc. 34, DeVaney Aff. at ¶ 15.)  Thus, it is crucial for the outcome of the pending motions to establish the qualifications and opinions of the experts.

### 1.    David B. Powell

Dr. Powell has had a career spanning over twenty-five years that has been devoted to testing, engineering and performing failure analysis of composite materials. (Doc. 38, Powell Aff. at ¶ 1.)  He is an experienced cyclist, having ridden bicycles for more than 35 years. (*Id.* at ¶ 2.)  He has also torn down and rebuilt many bicycles for both his personal use and the use of his friends.  AAF # 26.  Powell is currently the Director of Mechanics at Southern Research Institute, and he has previously participated in a development program for bicycle components.  AAF # 21.  Powell has extensive knowledge of engineering, and he specializes in high-

performance composites.  AAF #23.

Due to the loss of Ladner's fork, Dr. Powell was unable to perform tests on the actual fork that failed.  (Doc. 38, Powell Aff. at ¶ 2.)  However, he did perform tests on exemplar forks and applied similar forces that would have occurred in the course of Ladner's accident.  (*Id.*)  He posited that carbon fiber forks are "essentially insensitive to fatigue," because "[t]he fibers in carbon fiber composites act as crack stoppers, bridging any small cracks and preventing them from opening any further." (*Id.* at ¶ 4.)  Based on the performance of similar exemplar forks, Dr. Powell concluded that Ladner's fork "was either not sufficiently reinforced with carbon fiber, or had an inadequate bonding between the carbon fiber and metallic leaves meant to reinforce otherwise brittle and low-strength matrix epoxy 'glue'." (*Id.* at ¶ 2.)

### 2.    Dr. Thomas Talbot

Dr. Talbot is a licensed professional engineer with a specialty in material science and mechanical design.  AAF # 34.  He is Professor Emeritus of the Department of Mechanical Engineering at the University of Alabama at Birmingham. (*Id.*)  Dr. Talbot is also an avid cyclist, and he has personal knowledge of the operation, maintenance, inspection, transport, and repair of bicycles. (Doc. 38, Talbot Aff. at ¶ 2.)  He personally inspected the scene of Ladner's accident, inspected the failed fork prior to its disappearance as well as exemplar forks, and he communicated

with Ladner regarding the accident.  (Doc. 14, Talbot Aff. at 1.)

Based upon his expertise and examination of the failed fork, Talbot initially opined that the carbon fork failed as a result of carbon fibers that were "not properly or adequately [] bonded to the matrix material in the bicycle fork."  (*Id.* at ¶ 1.) Further, he opined that the failure was due to "fiber-matrix interface failure."  (*Id.* at ¶ 2.)  He additionally noted that the wheel of Ladner's bicycle was in good condition, and that there was no evidence of any prior damage or abuse that contributed in any way to cause the failure of Ladner's fork.  (*Id.* at ¶ 3.)  Therefore, Talbot concluded that the bicycle fork failed in such a manner as to give rise to the conclusion that it was not fit for the purpose for which it was intended.  (*Id.* at ¶ 6.)

He also supplemented his initial statement in opposition to the Defendant's motion for summary judgment.  (Doc. 38, Talbot Aff.)  Talbot supplemented his opinion by adding that the instruction manual did not provide any information as to how Ladner should have inspected, maintained, or replaced the carbon fork in his bicycle.  (*Id.* at ¶ 1.)  He further offers that an experienced cyclist, would not expect a bicycle fork to fail catastrophically without "some sort of extreme precipitating event," and that there was no evidence to indicate that any such extreme event contributed to or caused the catastrophic failure of the fork.  (*Id.* at ¶ 2.)  Talbot also attended and participated in tests arranged by Dr. Powell, also reaching the

conclusion that due to the extreme amounts of force required to cause exemplar forks to fail, Ladner's own fork failure was likely the result of a manufacturing defect. (*Id.* at ¶ 3-4.)

### 3.    Eric White

Eric White is a manager and bike mechanic for VeloCity Pro Cycle in Tuscaloosa, Alabama and has worked in the bicycle industry for nearly eight years. AAF # 46.  He provided services and products for Ladner's bicycle.  AAF # 47.  He examined and repaired Ladner's bike after his accident in 2006, and he continued to perform maintenance on the bicycle afterwards.  (Doc. 29, White Aff. at ¶ 5.)  Given his experience maintaining and repairing bicycles, White opines that Ladner did nothing to contribute to the failure of the carbon fork and that the accident was caused by a defect alone.  (*Id.* at ¶ 6.)

### 4.    Mike Hurley

Mike Hurley is the manager of Bob's Bikes in Vestavia, Alabama, which is a certified Litespeed dealer; he is also a competitive cyclist and bicycle mechanic. AAF # 50.  Hurley has been a competitive cyclist for more than sixteen years and has extensive knowledge and training in inspecting, maintaining and repairing all components of bicycles.  (Doc. 38, Hurley Aff. at 1.)  He is also familiar with the owner's manuals that accompany Ladner's bike.  (*Id.*)  According to Hurley, a minor

incident, where only minimal repairs were necessary such as truing the wheel, would not require removal of the fork for inspection, and the Litespeed instruction manual does not provide any specific guidelines for when the fork must be removed.  (*Id.*)  Based on his training, background, and experience, an accident such as the one suffered by Ladner does not occur but for some defect in the carbon fork.  (*Id.*)

## III.   THE MOTIONS TO STRIKE

Because Ladner relies upon the affidavits of Dr. Talbot, Dr. Powell, Eric White, Mike Hurley, Joe Hughes, and Mike Samford in support of his opposition to Defendant's Motion for Summary Judgment, the Court first addresses Defendant's Motion to Strike Affidavits, Testimony & Exhibits (Doc. 50), as well as the *Daubert* component of the Motion for Summary Judgment (Doc. 48).  As the motion to strike effectively moves to eliminate all evidence relied upon by Ladner in his opposition (*see* Doc. 50 at 1), the Court first addresses the substance of this motion before turning to the *Daubert* motion.

### A.   Motion to Strike Affidavits, Testimony, and Exhibits

Federal Rule of Civil Procedure 56(e) requires that: "Supporting and opposing affidavits shall be made on personal  knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  It is well-settled that self-serving or conclusory

11

affidavits, submitted by a nonmoving party in opposition to a motion for summary judgment, will not create an issue of fact for trial. *See e.g., Early v. Champion Int'l. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (finding that conclusory, self-serving, or uncorroborated allegations in an affidavit could not create issues of fact sufficient to defeat well-supported summary judgment.). Further, "[b]ald conclusions, opinions, and hearsay without supporting specific facts are not admissible and do not create a genuine issue of material fact." *Williams v. Hager Hinge Co.*, 916 F.Supp. 1163, 1168 (M.D. Ala. 1995) (citing *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

"Because affidavits must be based on personal knowledge, an affidavit based on nothing more than 'information and belief' is not sufficient as a matter of law." *See Givham v. Electronic Engineers, Inc.*, 4 F.Supp.2d 1331, 1334 (M.D.Ala. 1998); *Reeves v. Thigpen*, 879 F.Supp. 1153, 1164-66 (M.D.Ala 1995). "An affidavit must be stricken when it is a conclusory argument rather than a statement of fact, or when the affidavit is not based on personal knowledge." *Story v. Sunshine Foliage World, Inc.*, 120 F.Supp. 2d 1027, 1031-1032 (M.D. Fla. 2000). A motion to strike should state precisely the portions of the affidavit to which objection is being made, and the grounds therefor. *Olympic Ins. Co. v. H.D. Harrison Inc.*, 418 F.2d 669, 670 (5th

Cir.1969)[5]. If no objection is made to inadmissible statements, then the Court may consider them on a motion for summary judgment. *See Givhan v. Electronic Engineers, Inc.*, 4 F. Supp. 2d 1331, 1335 ( M.D. Ala. 1998) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir.1988)).

Defendant's Motion to Strike seeks to exclude nearly all of the evidence relied upon by Ladner in support of his opposition to the Motion for Summary Judgment. (Doc. 50 at 1.) Defendant relies upon a myriad of reasons for striking the evidentiary material, including a lack of notarization, a failure to disclose expert witnesses or opinions, contradictory opinions, lack of personal knowledge, and the affiants' use of the phrase "to the best of my knowledge". (*Id.* at 1-2.)

As a general objection to all affidavits relied upon by Ladner, Defendant argues that the Court should strike any affidavit that uses the phrase "to the best of my knowledge." (*Id.* at 2.) To support this argument, American relies upon a former Fifth Circuit decision, *Robbins v. Gould*, 278 F.2d 116 (5th Cir. 1960). In *Robbins*, the family of the deceased Rufus Robins disputed with A. Harvey Gould as to who should receive compensation from a condemnation proceeding. *Id.* at 117. In the district court, Gould filed a motion for summary judgment, on which he prevailed,

---

[5]   *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

and the Robbinses appealed.  *Id.*

The evidence in support of Gould's motion established that the tract at issue had been deeded by Robbins to a company in 1917 in return for shares of stock in the company.  *Id.*  In 1922, the company recorded the minutes of a meeting of all stockholders and therein noted that the Secretary of the company would have power to execute deeds in its name.  *Id.*  Robbins was not among those present at the meeting, and it was further noted that Robbins had previously sold all of his interest in the company.  *Id.*  Later, the company was dissolved, and the surviving directors signed a deed over to Gould.  *Id.* at 118.

The Robbinses' claim rested solely upon the showing that Rufus Robbins owned shares of the company in 1917, as well as an affidavit from Rufus's wife, Florence, who stated that "to the best of my knowledge and belief, at no time prior to his death did [Robbins] sell or transfer [his] shares of stock to any other person or persons."  *Id.*  The Fifth Circuit found the affidavit to be insufficient under Rule 56(e), because it was not based upon the affiant's personal knowledge.  *Id.*  The court wrote that the affidavit was "[a]t best . . . nothing more than Florence N. Robbins's opinion given without any demonstrated basis of knowledge."  *Id.*  Thus, the court found that the affidavit was insufficient to create an issue of fact.  *Id.*

*Robbins* has no effect on the outcome of the motion to strike, as it only stands

14

for the unremarkable and long-established position that an affidavit provided under Rule 56(e) must be supported by personal knowledge.   The court in *Robbins* discredited Florence Robbins's statement because she had no personal knowledge of whether her husband sold his shares of stock; thus her affidavit was only an opinion and did not create a genuine issue of material fact.

The use of the phrase "to the best of my knowledge" in the challenged affidavits is posited merely as a matter of form; it is in no way related to the substance of the testimony.   For example, Mike Hurley's affidavit contains the challenged phrase when he states, "I swear of [sic] affirm that the above and forgoing [sic] is true to the best of my knowledge under penalty of perjury." (Doc. 38, Hurley Aff. at 2.) As Ladner correctly contends, this form of an unsworn declaration is permitted under 28 U.S.C. § 1746(2), which provides that:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

* * *

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Emphasis supplied).

Further, "as long as the unsworn declaration includes the phrase, 'penalty of perjury', and states the document is true, the verification requirements of 28 U.S.C. § 1746 will be satisfied." *Matter of Muscatell*, 106 B.R. 307, 309 (Bkrtcy. M.D. Fla. 1989). Thus, the court will not strike all of the Plaintiff's evidence merely because affidavits contain the surplusage "to the best of my knowledge." The Court finds that the affidavits are sworn within the form required by § 1746.

Having addressed Defendant's general objection to the affidavits, the Court now turns to each of the specific arguments raised as to the affidavits Ladner relies upon in his opposition.

### 1.    Dr. David Powell

Defendant argues that Dr. Powell never signed his affidavits under oath and that the Court should therefore strike them. (Doc. 50 at 3.) It argues that he made this "admission" during his deposition on September 11, 2008. (*See* Doc. 34, Powell Dep. at 20:14-17.) Defendant further notes that Powell's signatures are identical and

16

posits "that [i]t's essentially impossible to sign one's name exactly the same in all particulars four times." (Doc. 50 at 3.)    Regardless of whether Powell's previous affidavits technically complied with signature requirements, he submitted a November 3, 2008 affidavit (his most recent one), which purports to incorporate all prior opinions, and is notarized.  (Doc.  38, Powell Aff. at 1-2.)  Contrary to Defendant's assertions, the Court has no reason to doubt the veracity of his signature or the affidavit's notarization.  The Court will not strike the affidavit on this basis.

## 2.    Mike Hurley

Defendant next seeks to strike the testimony of Mike Hurley, who it claims was not disclosed in Plaintiff's Rule 26(a)(2) disclosures on February 1, 2008 (Doc. 20). (Doc. 50 at 4.)  Ladner has not responded to this argument, therefore the Plaintiff has conceded that Defendant's argument is correct.   Therefore, pursuant to Rule 37(c), the Court **STRIKES** the affidavit of Mike Hurley.

## 3.    Dr. Thomas Talbot

Defendants argue that Dr. Talbot should similarly be precluded from testifying about the failure to warn claim, since his affidavit exceeds the scope of his Rule 26(a)(2) expert witness disclosure of February 1, 2008 (Doc. 20).  However, the failure to warn claim is a recent addition to the complaint (*see* Doc. 45) and, as it has only been a part of the case since November 14, 2008, it strains credibility to argue

that Ladner was somehow late in supplementing his discovery responses. Insofar as Dr. Talbot's additional opinions came into the case after the close of discovery, the Court, during its November 7, 2008, telephone conference, gave the Defendant permission to depose Dr. Talbot.  The Court will not penalize Ladner simply because Defendant chose to move for summary judgment without again deposing Dr. Talbot.

### 4.    Eric White

Defendant next moves to strike the expert opinion of Eric White.  Although Plaintiff did identify White in his Rule 26(a)(2) disclosure of February 1, 2008, Plaintiff did not attach a report or affidavit of Mr. White.  As Defendant argues, this omission means that Ladner failed to comply with Rule 26(a)(2)(B), and the Court's Amended Scheduling Order of November 30, 2007 (Doc. 19), in which it instructed the parties to file a complete report as required by Rule 26(a)(2)(B) in the February 1, 2008 report.  (Doc. 19 at 1.)  Plaintiff has failed to respond to this argument, and there is no report filed by Ladner in compliance with the Court's Order.  Therefore, pursuant to Rule 37(c)(1), the Court **STRIKES** the affidavit of Eric White, as it did not comply with the Court's Amended Scheduling Order or Rule 26(a)(2)(B).

### 5.    Joe Hughes and Mike Samford

Defendant refers to the affidavits of Hughes and Samford as "inconsequential," but moves to strike "any expert-like testimony from these gentlemen."  (Doc. 50 at

7.)  However, nothing identified in these affidavits purports to be expert testimony and the Court's own review of the affidavits finds that Hughes and Samford have attested only to matters that are within their own personal knowledge.  Therefore, the Court declines to strike these affidavits.

###   B.   *Daubert* Motion to Exclude Plaintiff's Experts

Turning now to Defendant's *Daubert* motion, which is incorporated into the Motion for Summary Judgment (Doc. 48), the Court begins by restating the legal standard for expert witnesses as provided in its prior opinion in this case, *Ladner v. Litespeed Mfg. Co.*, 537 F. Supp. 2d 1206, 1210-1213 (N.D. Ala. 2008) (quoting *United States v. Frazier*, 387 F.3d 1244, 1259-1263 (11th Cir. 2004):

> The starting point for our analysis is Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:
>
> > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> As the Supreme Court made abundantly clear in *Daubert*, Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence. 509 U.S. at 589 n. 7, 597, 113 S.Ct. at 2795 n. 7, 2798. The trial courts are also

required to play the same gatekeeping function considering the admissibility of technical expert evidence. *Kumho Tire* [*Co., Ltd. v. Carmichael*, 526 U.S. [137], 147, 119 S.Ct. [1167], 1174[, 143 L.Ed.2d 238 (1999)]. This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *McCorvey* [*v. Baxter Healthcare Corp.*], 298 F.3d [1253,] 1257 [(11th Cir. 2002)].

The importance of *Daubert*'s gatekeeping requirement cannot be overstated. As the Supreme Court framed it in *Kumho Tire*: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991) ("Weinstein")). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED.R.EVID. 703.

Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or

specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794). While there is inevitably some overlap among the basic requirements--qualification, reliability, and helpfulness--they remain distinct concepts and the courts must take care not to conflate them. *Quiet Tech.* [*DC-8, Inc. v. Hurel-Dubois UK Ltd.*], 326 F.3d [1333], 1341 [(11th Cir. 2003)].

The proponent of expert testimony always bears "the burden to show that his expert is 'qualified to testify competently regarding the matters he intend [ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact.' " *McCorvey*, 298 F.3d [at] 1257 (alterations in original) (quoting *Maiz* [*v. Virani*], 253 F.3d [641] 664 [(11th Cir. 2001)]). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.

Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, experience, training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." FED.R.EVID. 702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an

expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' " FED.R.EVID. 702 advisory committee's note (2000 amends.) (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation--i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. As the Supreme Court put it, "the Rules of Evidence– especially Rule 702– . . . assign to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation." *Id.* at 597, 113 S.Ct. at 2799.

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested;
> (2) whether the theory has been subjected to peer review
> and publication; (3) the known or potential rate of error of
> the particular scientific technique; and (4) whether the
> technique is generally accepted in the scientific
> community.

*Quiet Tech.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256
(citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)).

These factors are illustrative, not exhaustive; not all of them will apply
in every case, and in some cases other factors will be equally important
in evaluating the reliability of proffered expert opinion. See Kumho
Tire, 526 U.S. at 150- 152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702
advisory committee's note (2000 amends.); *see also Heller v. Shaw
Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999) ("[N]ot only must each
stage of the expert's testimony be reliable, but each stage must be
evaluated practically and flexibly without bright-line exclusionary (or
inclusionary) rules.").

The same criteria that are used to assess the reliability of a scientific
opinion may be used to evaluate the reliability of non-scientific,
experience-based testimony. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at
1176; *see also Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir.1999)
("In determining whether an expert's testimony is reliable, the Daubert
factors are applicable in cases where an expert eschews reliance on any
rigorous methodology and instead purports to base his opinion merely
on 'experience' or 'training.'"). As the Supreme Court explained in
*Kumho Tire*:

> In certain cases, it will be appropriate for the trial judge to
> ask, for example, how often an engineering expert's
> experience-based methodology has produced erroneous
> results, or whether such a method is generally accepted in
> the relevant engineering community. Likewise, it will at
> times be useful to ask even of a witness whose expertise is
> based purely on experience, say, a perfume tester able to

> distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151, 119 S.Ct. at 1176. Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. As a result, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152, 119 S.Ct. at 1176. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial. *See* FED.R.EVID. 702 advisory committee's note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. See 4 Weinstein's Federal Evidence § 702.03[2] [a].

Because of the powerful and potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see Rouco*, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (*per curiam*) (finding that admission

24

of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in FED.R.EVID. 702"); *see also United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence"). Indeed, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632; *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

### 1.      Qualifications

Given these standards, the Court first turns to the qualifications of Dr. Powell and of Dr. Talbot, the experts primarily relied upon by Ladner in his opposition. Since the Court has already reached the issue of Dr. Talbot's qualifications (as relates to his initial opinions listed at Doc. 14, Talbot Aff.) in its February 14, 2008 Memorandum Opinion and Order (Doc. 21 at 9), it need not revisit its prior decision. Defendant provides no basis for the Court to reconsider its prior Order. However, in his opposition, Ladner offers four additional opinions from Dr. Talbot relevant to the case. (Doc. 38, Talbot Aff.)  Talbot is qualified to provide his opinion insofar as it relates to matters within his personal knowledge or expertise, thus paragraphs, two, three and four are properly considered by the Court.  However, the Court finds that Dr. Talbot is not qualified to testify that, "[t]here is nothing in the instruction manual

25

that came with Ladner's bicycle with reference to how to inspect; maintain; or remove; or when to replace a carbon fiber fork on this bicycle." (*Id.* at ¶ 1.) This opinion is not within his expertise as a composite materials engineer and is not helpful to the trier of fact. Therefore, this paragraph in its entirety is hereby **STRUCK**. In all other respects, Dr. Talbot is qualified to provide his opinion.

As to Dr. Powell, Defendants argue that his proffered testimony is "wholly outside his field of expertise or knowledge." (Doc. 48 at 24.) However, the Court finds that Dr. Powell is adequately qualified to testify as to the strength and failure rate of composite materials. Dr. Powell has had a lengthy career related to the testing, engineering and performance of failure analysis of composite materials. (Doc. 38, Powell Aff. at ¶ 1.) Powell has extensive knowledge of engineering, and he specializes in high performance composites. AAF #23. Thus, Defendant offers nothing more than conclusory allegations to challenge Dr. Powell's qualifications and, in the face of substantial evidence to the contrary, the Court finds that Ladner has adequately established Dr. Powell's qualifications.

### 2.    Reliability

The bulk of Defendant's challenges lie with the reliability of the testing used by Dr. Talbot and by Dr. Powell. Defendant has provided no basis for the Court to reconsider its prior rulings on Dr. Talbot's opinion, *See Ladner*, 537 F.Supp. 2d 1206.

Dr. Talbot's initial opinions were not based on the now-disputed testing performed on exemplar forks, but were based on Talbot's review of photographs of the failed fork. (*See* Doc. 14, Talbot Aff. at 1.)   Thus, the primary issue is whether the Court may consider Powell and Talbot's opinions regarding their testing of exemplar forks in similar loading conditions.

Defendant's brief primarily makes conclusory objections to the reliability of the proffered opinions of Powell and Talbot.  For example, Defendant argues that the testing exerted only mono-directional forces on the exemplar forks, that having the failed fork would have produced more reliable results, and that Powell's and Talbot's testing did not simulate the effect of the accumulated fatigue of Ladner's riding. (Doc. 48 at 28-36.)

While the critiques of the methodology used by Talbot and Powell would be effective points to raise on cross-examination, they do not prove that the testimony is not the product of reliable principles and methods.  Dr. Powell's and Dr. Talbot's testing of exemplar forks provided an uncomplicated, easily repeatable test that demonstrated the force necessary to cause similar carbon forks to fail.  While it certainly would have been helpful to have the failed fork in rendering the opinion, it does not mean that the test performed is unreliable.  Indeed, Defendant's objections are more appropriately reserved for cross-examination than the instant *Daubert*

motion. *See Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999) ("'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.'") (quoting *Daubert*, 509 U.S. at 596).

Contrary to what Defendant contends, there is no "analytical gap" between Powell's and Talbot's conclusions that Ladner's fork failed as a result of defect, and their testing. (Doc. 48 at 37.) Indeed, Ladner's experts collected data about the strength of other, properly functioning carbon forks and reached the conclusion that Ladner's own fork must have failed as a result of defect. Defendant is entitled to attack those conclusions and could have offered its own expert testimony as to disputed matters in the case, but it has made no showing in the instant *Daubert* motion that the opinions offer by Ladner in support of his case are so unreliable that they should not be considered by the Court in evaluating the motion for summary judgment.

### 3. Helpfulness to the trier of fact

Finally, it is clear that Dr. Powell's and Dr. Talbot's testimony is helpful to the trier of fact. Their testimony relates to highly complicated matters involving composites and the load-bearing capacity of those materials; undoubtedly, this subject involves matters "beyond the understanding and experience of the average citizen."

*Rouco*, 765 F.2d at 995.

Thus, Defendant's *Daubert* motion, submitted as part of its motion for summary judgment, is due to be **GRANTED IN PART**.  The Court will not consider Dr. Talbot's opinion insofar as it purports to state whether any warning in the owner's manual would have prevented the accident, as this opinion is not within Dr. Talbot's expertise or qualifications.  In all other respects, the *Daubert* motion is due to be **DENIED**.

## IV.    MOTION FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id*. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled

to summary judgment." *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir.1987) (citation omitted).

**B.    Analysis**

Having addressed American's motions to strike and determined what evidence it may consider, the Court now turns to the its Motion for Summary Judgment. For reasons discussed below, that motion is due to be **GRANTED IN PART**, and is otherwise **DENIED**.  Ladner has brought claims based on the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), breach of warranty, negligence, and failure to warn.  The Court first turns to Plaintiff's AEMLD claims.

**1.    AEMLD-Manufacturing Defect**[6]

_____

[6] Ladner stipulates that summary judgment is due to be **GRANTED** on any claim for defective design.  (Doc. 49 at 30.)

In order to prevail on his AEMLD claim, Ladner must demonstrate that he "was injured or damaged by a product, which was sold 'in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer' by one 'engaged in the business of selling such a product,' where the product was 'expected to and [did] reach the [plaintiff] without substantial change in the condition in which it [was] sold.'" *Horn v. Fadal Machining Centers, LLC*, 972 So. 2d 63 (Ala. 2007) (quoting *Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 132-33 (Ala.1976)).

> Under the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably safe for its intended purposes and uses. However, the manufacturer of a product is not an insurer against all harm that might be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product. In fact . . . the failure of a product does not presuppose the existence of a defect. The fact that someone was injured while using a product does not establish that the product was unreasonably dangerous when put to its intended use. Proof of an accident and injury alone is insufficient to establish fault under the AEMLD. Rather, because the AEMLD is a fault-based cause of action, the plaintiff must prove more than the fact that an injury occurred while [the plaintiff was] using the product. Under the AEMLD, the plaintiff must affirmatively show a defect in the product.

*Verchot v. General Motors Corp.*, 812 So.2d 296, 301 (Ala. 2001) (internal quotation marks and citations omitted).

Defendant first argues that Ladner cannot prevail in a "defective manufacture" case because he cannot demonstrate defect at time of sale. (Doc. 48 at 39-40.)

However, this argument appears to presuppose the success of the related *Daubert* motion.  As discussed previously, the Court has found that the *Daubert* motion is due to be denied insofar as it relates to Dr. Powell's and Dr. Talbot's opinions that only a defectively manufactured fork would have failed in similar circumstances.  These opinions themselves create a genuine issue of material fact, making summary judgment inappropriate.

Defendant cites to *Jordan v. Gen. Motors Corp.*, 581 So. 2d 835 (Ala. 1991), in support of its argument that Ladner has failed to demonstrate a defect and that he relies merely on the fact that an accident occurred to establish liability under the AEMLD.  (Doc. 48 at 40.)  However, the court in *Jordan* concluded that the plaintiff had not "affirmatively show[n] that the product was sold with a defect or in a defective condition" based on a total lack of proof showing defect at time of sale.  *Id.* at 837.  In *Jordan*, the defendant offered the affidavit of an engineer who personally certified that a seatbelt was not defective.  *Id.*  In opposition to the defendant's motion for summary judgment, the plaintiff offered only the testimony of an expert who noted that the plaintiff's seat belt indicated that she wore it often and that "if the seat belt were in use at the time of [the] accident, the unit failed to restrain [the plaintiff] in a proper manner."  *Id.*  Given this total lack of evidence, the court found that the plaintiff had not met her burden of proof.  *Id.* at 837-838.

*Jordan* does not apply to the instant case since Ladner, unlike the plaintiff in *Jordan*, has offered expert testimony that, if believed, affirmatively tends to prove a defect occurring at the time of sale.   Whereas the Defendants in *Jordan* offered completely unrebutted testimony that tended to prove that its seatbelt was not defective, Defendant has made no showing that Ladner's fork was not defective, and Ladner, bearing the ultimate burden of proof, has provided credible expert opinions concluding that his fork failed due to defective manufacturing.  Thus, Defendant is not entitled to summary judgment on Ladner's manufacturing defect claim brought under the AEMLD.

### 2.    Warranty Claims

In order "to sustain a claim for breach of an implied warranty, [Ladner] must show 'the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'" *Bagley v. Mazda Motor Corp.*,  864 So.2d 301, 315 (Ala. 2003) (quoting *Barrington Corp. v. Patrick Lumber Co.*, 447 So.2d 785, 787 (Ala. Civ. App.1984).  As with the Plaintiff's manufacturing defect claim, Defendant claims that the breach of warranty claim must fail because Ladner cannot show defect at the time of sale. (*See* Doc. 48 at 41.)  However, as the Court concluded *supra*, Ladner has presented sufficient evidence to demonstrate defect at time of sale. Therefore, the Court rejects this argument.

However, Defendant also claims that, as a matter of Alabama law, "a plaintiff cannot state a claim for breach of the implied warranty of merchantability; those claims must be raised under [the] AEMLD." (Doc. 48 at 42.)  In support of this argument, Defendant cites to two federal court decisions: *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp 1280 (M.D. Ala. 2001), and *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004).  However, as Ladner aptly notes, the Alabama Supreme Court held in *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101 (Ala. 2003) (answering a certified question from the court in 230 F.3d 1300) that "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product." *Id.* at 112.  Thus, Defendant has simply misstated Alabama law on this matter.

Defendant also argues that any warranty claim is void because the owner's manual disclaimed all warranties, writing that "[w]arranties for the bike in general *and the fork specifically* were disclaimed, excluded and limited." (Doc. 48 at 42 (emphasis in original). )  However, pursuant to Ala. Code § 7-2-316(5), a seller cannot disclaim liability "for damages or injury to the person in the case of consumer goods." *See also Bagley*, 864 So. 2d at 315 (finding an automobile seller could not disclaim implied warranties when a consumer suffered personal injury in an accident).

34

Thus, the Court rejects Defendant's argument that a disclaimer bars Plaintiff's warranty claim.

### 3.    AEMLD–Failure to Warn

The elements of a negligent and/or wanton failure to warn claim consist of (1) a duty owed, (2) a breach of that duty, and (3) causation of an injury or damage. *Rutledge v. Arrow Aluminum Industries, Inc.*, 733 So.2d 412, 417 (Ala. Civ. App. 1998). "A negligent- or wanton-failure-to-warn claim cannot be submitted to a jury unless there is substantial evidence that the [alleged] inadequate warning would have been read and heeded and that it would have prevented the accident." *Sears, Roebuck & Co. v. Harris*, 630 So.2d 1018, 1030 (Ala.1993).  Even if a product is otherwise unreasonably dangerous under the AEMLD, an adequate warning may obviate the AEMLD claim.  *See Tillman v. R.J. Reynolds Co.*, 871 So.2d 28, 32 (Ala. 1993) (quoting *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976)).  Defendant presents several theories that it claims entitles it to summary judgment, namely: (1) that Defendant provided an adequate warning that obviates any AEMLD claim; and (2) that Ladner did not read or follow the owner's manual.  (Doc. 48 at 42-54.)

Defendant has cited several cases in support of its argument that the warnings which accompanied the bicycle obviates any AEMLD claim and therefore entitles it to summary judgment.  However, the cases offered by Defendant on this point involve

35

claims of defective <u>design</u> and not defective <u>manufacture</u>. *See, e.g.*, *Tillman*, 871 So. 2d at 32-34 (finding that cigarettes as designed were not an "unreasonably dangerous product," and that in any event, even if they were unreasonably dangerous, that danger was "obviated by an adequate warning, i.e. the federally mandated surgeon general's warning . . . ."); *Cook v. Branick Mfg., Inc.*, 736 F.2d 1442, 1446 (11th Cir. 1984) (upholding a jury's finding that a tire rim was not unreasonably dangerous as designed and that, in any event, the defendant provided an adequate warning); *Yarbrough*, 628 So. 2d at 480-482 (Ala. 1993) (stating that danger may be obviated by an adequate warning, but concluding that kerosene heater was not unreasonably dangerous as designed).  As previously discussed, Ladner does not allege that his bicycle was defectively designed; rather, he presents evidence through his experts indicating that his accident was caused by a defectively manufactured fork, that is, one which deviated from the norm.  Thus, none of the cases cited by Defendant applies to the instant case.  In its own research, the Court has discovered no cases in which a warning obviated the danger in a defectively <u>manufactured</u> product. Common sense also dictates this conclusion since it would unreasonable to conclude that Defendant warned that its bicycle fork would have a defect caused by the manufacturing process, causing the fork to catastrophically fail within its normal life-cycle.

Further, even if it were possible to warn of an unforeseen manufacturing defect, none of the warnings cited by Defendant do so. For instance, Defendant cites to page fifty (50) of the owner's manual, which states:

> Like any mechanical device, a bicycle and its components are subject to wear and stress. Different materials and mechanisms wear or fatigue from stress at different rates and have different life cycles. If a component's life cycle is exceeded, the component can suddenly and catastrophically fail . . . . Scratches, cracks, fraying, and discoloration are signs of stress-caused fatigue and indicate that a part is at the end of its useful life . . . .

(Doc. 34, Ex. G at 50.) Another cited warning states:

> Crash or other impact can put extraordinary stress on bicycle components, causing them to fatigue prematurely. Components suffering from stress fatigue can fail suddenly and catastrophically, causing loss of control, serious injury or death.

(*Id.* at 56.) Defendant has not claimed that Ladner's bike failed because it was old, which forecloses any claim that the warning listed at page fifty (50) adequately warned Ladner; instead, it argues that his 2006 accident caused a crack in the fork, which gradually deteriorated the component, causing the catastrophic failure. While this may implicates the second warning at page fifty-six (56), Ladner claims that his 2006 accident was minor and that there was no visible damage to the frame. He also notes that he would carefully inspect his bicycle for cracks each time before he rode. His version of the facts is to be credited in addressing Defendant's motion for

37

summary judgment.  These facts, coupled with his expert's testimony, give rise to an inference that a manufacturing defect caused the failure and not a "crash or other impact," as implicated by the warning at page fifty six (56) of the owner's manual. Nothing in the above warnings, or any other warning in the owner's manual cited by Defendant warns of catastrophic failure <u>due to a manufacturing defect</u>.

Finally, Defendant claims that Ladner's failure to warn claim is barred by his failure to read the owner's manual to his *Blade*, since it negates the element of proximate cause.  (Doc. 48 at 48.)  "The element of proximate cause is essential to the plaintiff's prima facie case of negligent failure to adequately warn. A negligent-failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring." *Gurley By and Through Gurley v. American Honda Motor Co., Inc.*, 505 So.2d 358, 361 (Ala.,1987) (citing *E.R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963 (Ala.1985)).

Once again, a genuine issue of material fact prevents the Court from granting summary judgment in Defendant's favor.  Both parties rely on Ladner's deposition in support of their opposing positions on this issue.  During that deposition, Ladner testified as follows.

38

Q.    Okay.  Did you read the owner's manual that came with this bicycle?

A.    No.

Q.    Why not?

A.    I had a lot of experience by that point.  I mean so—I didn't.

Q.    So at the time of this accident in May, you had not read the owner's manual [for this particular bike]? . . . .

A.    Actually, let me look at that.  Actually, I think I did read it right when I got it but very briefly and I haven't touched it since.  I remember just looking at it; I remember glancing over it.

Q.    So would it be your testimony that when you got it you glanced over it but didn't read it thoroughly?

A.    I would say that would be accurate.

(Doc. 34, Ladner Dep. at 147:12-148:15.)  While Ladner initially said that he did not read the owner's manual at all, he changed his answer saying instead that he briefly read the manual after he purchased the bicycle.  Given that all reasonable inferences are to be rendered in favor of Ladner, and since Defendant bears the burden of demonstrating that there is no genuine issue of material fact, there simply is not sufficient evidence to say that Ladner did not read the warnings.  A reasonable juror could conclude, based on Ladner's cursory glance at the owner's manual, that he would have read and heeded any additional, adequate warning.  Moreover, as stated above, no warning of a manufacturing defect was given.  Therefore, Defendant is not entitled to summary judgment on this ground.

4.        Contributory Negligence and/or Assumption of Risk

Defendant next briefly argues that Ladner's claims are barred by the doctrine of contributory negligence and/or assumption of risk. However, this argument, as with all of Defendant's other arguments, depends on a number of disputed facts, such as whether the April, 2006 accident caused a fracture that ultimately resulted in Ladner's more serious accident in May, 2007. (Doc. 48 at 54-55.) Further, Defendant cites no case law in support of its contributory negligence/assumption of risk argument and, in its own brief, it notes that "proximate cause and contributory negligence are usually jury issues . . . ." (Doc. 48 at 55.)

However, Defendant does raise a unique argument that, "[r]acing competition bicycles or other vehicles necessarily involves serous risks," and that "[u]nder Alabama law, "there is a very unique exception allowing enforcement of pre-injury releases and exculpatory clauses in the racing context." (*Id.*) (citing *Barnes v. Birmingham Intern. Raceway, Inc.*, 551 So. 2d 929, 932 (Ala. 1989). However, this principle and the case cited in support of it is entirely inapplicable to the current facts. In *Barnes*, the plaintiff had signed a release prior to a stock car race in which he had suffered injury. Denying his claim for negligence, the court noted that "[i]n Alabama, general pre-race releases exculpating one from liability for negligent and wanton conduct have been upheld as valid and not void as against public policy." 551 So. 2d

40

at 931-932.  As Ladner did not have his accident during a race, and as Defendant has presented no evidence that Ladner signed a release of any sort, *Barnes* is plainly inapplicable.  Thus, Defendant's argument that it is entitled to summary judgment because of contributory negligence and/or assumption of risk is without merit and summary judgment is not due on this ground.

### 5.    Legal Effect of the Absent Fork

In a final attempt to dispose of this case, Defendant reasserts its previously rejected spoliation argument.  (Doc. 48 at 56.)  Despite entitling this section "The Legal Effect of the Absence of the Failed Fork," Defendants never explicitly say what they believe the legal effect of the lost fork is.  On one hand, while disavowing a spoliation argument, Defendant argues that "the missing fork nevertheless has a legal effect sufficient to influence the dismissal of this case" but, on the other hand, Defendant acknowledges that it "makes no showing now of willfulness or bad faith, and thus is not entitled to dismissal."  (*Id.* at 57.) (citing *Ladner*, 537 F.Supp. 2d at 1218).  To the extent that the argument is a motion to reconsider the Court's prior ruling, Defendant has not made the requisite showing for a motion to reconsider.  *See Young v. City of Gulf Shores,* No. 07-0810-WS-M, 2009 WL 321221 at * 1(S.D. Ala. Feb. 5, 2009) ("[a] motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of

new evidence, or the need to correct clear error or manifest injustice.") (quoting *Summit Medical Center, Inc. v. Riley*, 284 F.Supp.2d 1350, 1355 (M.D.Ala.2003)). Additionally, the extent that Defendant seeks an order preventing Ladner from further using his bicycle, the deadline for discovery expired on May 1, 2008. (*See* Doc. 13 at 1.)  There has been no request for additional discovery. Further, this Court has been apprised of no request for production under Federal Rule of Civil Procedure 34 that has been issued by the Defendant or ignored by the Plaintiff during discovery.

## V.    CONCLUSION

For the reasons discussed above, Defendant's motion to strike is due to be **GRANTED IN PART** and otherwise **DENIED**.  In a separate order, the Court will strike the affidavits of Mike Hurley and Eric White.  American's *Daubert* motion to strike expert testimony is due to be **GRANTED IN PART** and otherwise **DENIED**. In a separate order, the Court will strike those portions of Dr. Talbot's expert opinion that are not within his area of expertise or his personal knowledge. Finally, the Motion for Summary Judgment is due **GRANTED IN PART** and otherwise **DENIED**.  Defendant is entitled to summary judgment on any design defect AEMLD claim, as that portion of  the motion is unopposed by Ladner.  In all other respects, the motion is due to be **DENIED**.

**DONE** and **ORDERED**, this the 24th day of February, 2009.


**VIRGINIA EMERSON HOPKINS**
United States District Judge